GEORGE W. WILLIAMS, EXECUTOR, ESTATE OF FRANCIS WILLIAMS, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54087. Promulgated November 8, 1935.

*Ferdinand Tannenbaum, Esq.,* for the petitioner.
*L. W. Creason, Esq.,* for the respondent.

### SUPPLEMENTAL OPINION.

LEECH: This proceeding involves two questions: (a) The application of section 44 (d) of the Revenue Act of 1928, and (b) the fair market value on September 3, 1928, the date of decedent's death, of his interest in two promissory notes. These notes were the property of decedent and two associates in equal amounts and had a total unpaid balance on that date of $355,399.92.

By opinion promulgated July 31, 1934, we sustained the respondent upon both issues, holding that section 44 (d) applied, that the

unrealized gain, represented in this installment obligation, was realized and taxable on his death, and that the notes had a fair market value, for the purpose of computing such gain, equal to their face value.

On August 3, 1934, our decision was entered, redetermining a deficiency of $7,906.02 for the period from January 1 to September 3, 1928. From this decision petitioner prosecuted a petition for review to the United States Circuit Court of Appeals for the Third Circuit and we are now in receipt of the mandate of that court, entered September 17, 1935, remanding the cause for further proceedings in accordance with the opinion of the court.

By its opinion the Circuit Court sustains the Board on the issue as to the application of section 44 (d) of the Revenue Act of 1928, but remands the proceeding for further consideration by us upon the issue as to the market value of the installment obligation. On this question the opinion states:

We think, however, that the case should be remanded to the Board of Tax Appeals for further consideration of the issue as to the value of the instalment obligation. It appears that the Board's finding as to the value of the instalment obligation was in part based on the fact that the petitioner had returned the instalment obligation at its face value for both federal and state inheritance tax purposes; that all due payments had been faithfully met by the obligor up to the time of the decedent's death; and that there was no evidence that the obligor was in poor financial condition. It appears, however, to have been assumed by the Board that the collateral securing the payment of the instalment obligation had a market value at the time of the decedent's death substantially in excess of the liabilities which it secured. Nowhere in the opinion of the Board does it appear that it took into consideration the fact that the 2,000 shares of bank stock, pledged as collateral and having an estimated value of $190,000, were pledged as collateral to secure the obligations due the two other parties to the sale of the Bank & Trust Company stock, in addition to the obligation due the decedent. Inasmuch as the Board's determination of the value of the instalment obligation appears to have been based partly on the assumption that the value of the collateral was in excess of the obligation which it was intended to secure, we think the Board should clarify its findings upon this point. *Helvering* v. *Taylor*, 293 U. S. 507.

In our opinion of July 31, 1934, we found that the collateral securing the payment of the obligation here in question "had a market value at the time of death substantially in excess of the liabilities, the payment of which it secured." In compliance with the mandate of the court, we can, to clarify this finding, only set out the facts which convince us that the collateral, consisting of stock of the Broad & Market National Bank & Trust Co. of Newark, New Jersey, deposited to secure payment of the obligations of the purchaser to petitioner's decedent and his associates, was substantially in excess of the total of these obligations.

The record shows that petitioner's decedent, Francis Williams, together with two associates, owned in equal amounts 1,059 shares of stock of the Broad & Market National Bank & Trust Co. of Newark, New Jersey. This stock they sold to George S. Silzer, Isaac Alpern, and John J. Stamler, on February 18, 1926, for a total consideration of $635,400 or at a price of $600 per share. The sum of $80,000 was paid in cash and the balance of $555,400 was evidenced by three promissory notes of $185,133.33 each, with interest at 6 percent per annum. One of these notes was executed by each of the three purchasers of the stock and all of the notes were made payable to petitioner's decedent and his two associates.

The total obligation evidenced by the three notes referred to, by a contract entered into between the parties, was provided to be paid at the rate of $100,000 per year from the date of sale. Under this agreement the notes were deposited with the Chase National Bank of New York City as trustee, together with the 1,059 shares of stock sold, endorsed in blank, to be held by the trustee as security for the payment of the notes.

On December 30, 1926, the parties executed a supplemental agreement, Silzer and Stamler having purchased the interest of Alpern in the stock. Under this agreement two notes were executed, one by Stamler and the other by Silzer, each in the sum of $277,700. These were substituted for the three notes of $185,133.33 each. It is indicated that, in the meantime, the capital stock of the Broad & Market National Bank & Trust Co. had been increased from $200,000 to $1,200,000 by the sale of 10,000 additional shares at par and, under this modified agreement, the 1,059 shares of stock deposited as collateral were released by the trustee for the issue of new stock, in the amount of 2,500 shares which were thereupon deposited as collateral. The agreement provided that upon the payment of $100,000 on the notes, 500 shares of the pledged stock should be released by the trustee to the purchasers.

On September 26, 1927, another agreement was executed between the parties to substitute for the note of George S. Silzer another note of John J. Stamler. The total obligation had been reduced by $100,000 and then stood at the sum of $455,400. After this substitution, the obligation was evidenced by two notes of John J. Stamler, each for the sum of $227,700, both made payable to petitioner's decedent and his two associates and secured by 2,000 shares of the bank stock.

The record further shows that on December 31, 1927, following execution of this last agreement, the 2,000 shares of bank stock, deposited to secure payment of the total obligations of $455,400, had a fair market value of $345 a share and a total market value of $690,000.

Petitioner's decedent died September 3, 1928. At that time the obligations in which he had a one-third interest had been reduced, by payments made on the notes, to a balance of $355,399.92, which balance was secured by the deposit of the 2,000 shares of bank stock as above set out. It is further shown that on September 29, 1928, following decedent's death there was a recapitalization of the Broad & Market National Bank & Trust Co., the par value of the stock was reduced from $100 per share to $25 per share and on December 31, 1928, the close of the year following this recapitalization and " split " of the stock, the market value of this new stock issued was $82 per share.

It is evident that the impression that the value of the collateral, deposited to secure the payment of both of these obligations, had a value not in excess of $190,000, arises through questions propounded by petitioner's counsel to a witness, William B. Harding, a banker of Newark, New Jersey, as to what, in his opinion, was the value of a note for $355,000 signed by Stamler and secured by collateral of 2,000 shares of Broad & Market National Bank & Trust Co. stock, on September 8, 1926. To this question the witness answered that the note would, in his opinion, have a value not in excess of the market value of the stock, which his recollection placed at about $95 a share. The basis of this opinion was that he had personally sold 25 shares of this stock in December of that year at $94 per share.

It is quite evident from an examination of the record and the facts disclosed with respect to this stock, that this witness was referring to the new stock issued after the split in September. Unless the fact of the stock " split " is kept in mind, it appears that the stock of the Broad & Market National Bank & Trust Co. decreased in market value between December 31, 1927, and December 31, 1928, from $345 a share to $82 a share, but it is very apparent that this is a decrease due to the dilution of the capital value of individual shares, since a price of $82 a share on December 31, 1928, is equivalent to a price of $328 per share for the old stock, deposited as collateral to secure the obligations here in question.

We have again given careful consideration to the evidence and, as stated in our opinion of July 31, 1934, we think that the 2,000 shares of old stock deposited to secure these obligations " had a market value at the time of death substantially in excess of the liabilities, the payment of which it secured." We think this conclusion is amply supported by the evidence, and that the detailed statement of the reasons for our conclusion, herein made, will sufficiently clarify our finding upon this point.

*Judgment will be entered of a deficiency in the sum of $7,906.02 for the period from January 1 to September 3, 1928.*